Our first case for today is 2023-40652, United States of America v. Leonard. Mr. Visosky. Good afternoon, Your Honors. May it please the Court, Counsel. I think this case is summed up pretty well by this Court's recognition in Massey that sometimes the line between good police work and a constitutional violation is quite fine. And here it was either on that line, but certainly it was close enough to the line of validity as discussed in Massey. And actually, although Massey does set forth the standards that the Court should apply, it's not a very helpful case in terms of the facts just because it was a very different situation. It involved just a lengthy detention of a defendant while the government tried to obtain a search warrant. So I think that the key case here is the Sixth Circuit's case and the claim that this Court and Massey relied on in formulating the good faith exception that's the focus of this case. One, it's – the facts are strikingly similar. One, it's just a very – it's a similar posture, for one thing, in that it's a government appeal – appealing a district court's grant of a suppression motion. Two, both cases involved a cracked door. Both cases involved the officers knocking and announcing before entering. Both cases, they didn't hear anything upon that. In McLean, the officers waited a little bit longer. I think it was two to five minutes. But it was a bigger house there, and I would argue that it was just a different factual situation, too, because here, as opposed to McLean, you had the emergent situation of Mr. Leonard's condition. In both cases, you had the officers deciding to enter to, quote-unquote, clear the residents of potential suspects or, in our case, Mr. Leonard's case, potential victims. And coincidentally, in both cases, the officers, when they were in there clearing the residents, they happened to find, in plain view, evidence of a marijuana group. So how do we grapple with this case? I guess I'm asking a standard of review question. You've conceded that there were no exigent circumstances, so you're not challenging sort of the underlying findings, but you kind of are. And I guess the thing I've been grappling with in the case is – so there's this line, right? One side of the line, it's constitutional. The other side of the line, it's not constitutional. If it's close enough to the line, then it's okay to justify the good faith exception, right? How do we sift that standard? Well, it's not exactly clear, Your Honor, and I'll own that. And we've looked to how this court post-Massie has applied this standard where there was a prior-in-time constitutional violation. So are the – so just hang with me a little bit. I guess I'm thinking through, again, back to standard review. Are we reviewing the court's findings for factual, clear error? I mean, and is it a finding that there are no exigent circumstances or the medical necessity didn't justify them going in? You know, the court sort of laid it all out and went through it. Was applying the same standards we're talking about, so that appeared to be correct. So are these fact findings? I don't think so, Your Honor, and I think McLean talks about that, that ultimately what the court is doing is looking at whether the district court erred and finding that the good faith exception doesn't apply. And that's a de novo determination. McLean says that. This court says that in United States v. Cherna. But we have to say that there are no exigent circumstances, right? Well – Because that's what the district court determined. Right, and to clarify – Based on the facts. Right, Your Honor. And to clarify our position, we don't concede that there weren't exigent circumstances. We're just assuming for the sake of argument. Well, you didn't press it. You said that Officer Bell's conduct was close to being proper. That doesn't sound like the government saying, this was exigent and it was all good. That's not much, I mean, that doesn't press an exigency argument. Well, I'm not sure why we said that Officer Bell's actions were close to being proper. I can find it. But we did argue exigent circumstances before the district court. We didn't in the objections to the magistrate judge's report recommendation. Mainly, and that was my call, and in the mood I got called on that of why didn't we argue that. But ultimately, it doesn't make a difference because if we lose on the good faith exception, we're going to lose on exigent circumstances. So I think it's just an easier position. And honestly, I could not find a case that has these facts that we could point to. So I didn't feel comfortable pressing that on the underlying exigent circumstances. But I do, I think we have a very strong argument on good faith. And again, McLean goes to that. Is it close enough to the line of validity? And I would point the court, we didn't discuss it so much in our briefing, but to Judge Boggs' concurrence there, he actually disagreed with the majority in McLean. He found that there were exigent circumstances. And what he recognized, and I think it's eminently reasonable, is that the officers are on the ground. They're exercising their professional judgment in real time. You mentioned reasonable. The standard is an objectively reasonable officer, right? Right, Your Honor. And one of the challenges I've got in the case is when I follow your line of reasoning, I find myself on a subjective cul-de-sac. You know, I've seen the video. I hear what the officers say. I think that their intentions are good if you hear what's in the video, right? But how is that not subjective versus objective? I've wrestled with that too, Your Honor. And it is an objective standard. But to some extent, I mean, you look at the cases, you look at McLean, what they look to was, one, it was not objectively unreasonable for these officers. In McLean, again, they found a light on in the house, no one was supposed to be there, the cracked open door, and they decided to go in just to see if, one, no one was squatting, some teenagers drinking or whatever, or if a robbery was in place. And what the court there found was that it wasn't objectively unreasonable for officers to go in to determine, to ensure that those things weren't happening. But they also looked to, and this is in the Sixth Circuit's analysis of whether it was close enough to the line, and this is at 566 of McLean, that there's no evidence that the officers knew that they were violating the Constitution. And I would agree with you, that sounds a little bit subjective. Well, but then, if there's no evidence that they knew they were violating the Constitution, I mean, it seems to me we're shielding a lot of conduct just sort of the willful ignorance, maybe. I mean, the district court went through all this, right, and the master judge did also, and so there's just no way in the world that you get to go into somebody's house once you knock and nobody answers. It doesn't really matter if the door is cracked open. Of course, the district court went into the coffee table and when it was mentioned and the other stuff and all that sort of thing. But still, how do we, again, we're back to what is close enough to the line and how do we draw that? Well, I think in this case, Your Honor, it is objectively reasonable. One, because you have extremely unusual circumstances. This isn't some old lady outside of her home with a walker nearby that she just fell down. It's a man in extreme unusual circumstances. He's in underwear that's torn, as Officer Bell said in her affidavit, with active bleeding that was signs of physical trauma. And I would argue that it was— Well, but she also said he reeked of PCP and clearly was high as a kite or very high, what have you. The district court went off on that and said, well, what the officers did was minimize the drug use and the fact that he was high and that was the cause. And sort of went off on these theories that allowed them to get into the house. But, Your Honor, the magistrate judge first made that call or that statement about the reason that Officer Bell was minimizing the reasons that—the real reasons that she went to the house. And that's just a deeply, deeply unfair characterization of what happened here. And I'm glad that the court has watched the video, and that was the one thing I was going to say if I left doing nothing else in this argument is to watch that video. No reasonable person can watch that video and think that Officer Bell went into that house to find evidence of drug use, that, oh, he's high on PCP. The offhand comment when she said that was when they were trying to take care of him. Officer Key first commented on it. She said, yeah, he's high. He's super high. That's when she's giving him her jacket and trying to— Correct, Your Honor. And all that. Correct, but she didn't run over to the house and try to find evidence of drug possession. She stayed there and tried to take care of him. It was only when Deputy Noyola radioed to her and said the door is open, which again, in addition to everything else that's unusual, that's an unusual situation. She goes over there. They testify. They see the broken coffee table, which again is unusual, and the magistrate judge— There's a lot that's unusual in the house. I mean, there's just piles of stuff everywhere. So I'm not sure why the broken coffee table necessarily stands out. It didn't to me when I'm watching the video and as they're knocking and entering. And she didn't mention it. It only came up later that this coffee table was one of the reasons that they felt like they should go in. Well, she didn't mention it in the affidavit, Your Honor, but we take serious issue with the magistrate judge's insinuation that Officer Bell, I think in the report and recommendation, says something. It's something that she may have only come up with at the hearing or whatever to justify the entry. As we pointed out in our objections and we cited in our brief, less than a month after this whole event, in writing up her police report for the Crockett PD, she mentions the broken coffee table as one of the reasons that they went in. So it entirely refutes the magistrate judge's insinuation that she had just come up with this on the fly to all of a sudden justify her entry once a motion to suppress is filed. You keep calling this insinuation. These were things that the magistrate judge said in the report and recommendation and were adopted by the district court. So I don't know that it's insinuation rather than factual determinations about the motivations of this officer based upon having a hearing. So why are we talking about it as some sort of side insinuation? It's actually a factor. So that's my first question. My second point, I'll go ahead and ask it because it's very related. Massey requires two independent things. They both have to be met, correct? And one of them is that the conduct must be close enough to the line of validity, and that's the good faith part, and we've been talking about that quite a lot. The second thing that is also required is that the search warrant was sought and executed by a law enforcement officer in good faith, and that's the part about the search warrant sought and executed, that those both have to be present. And the magistrate judge adopted by the district court was very adamant that the search warrant was not sought in good faith, and, in fact, there were all kinds of concealments and things. Am I wrong on that? And can you help me? Help me. Why are we calling it insinuations, and doesn't it matter? You have to win on both? Well, it does, Your Honor, but the magistrate judge was clearly wrong in finding in Massey the court said, and this is Massey at 531, you have to show that the executing officer knowingly hid or misrepresented the facts. It's completely unfair for the district court or the magistrate judge to say that Officer Bell knowingly hid or misrepresented facts, and what's the evidence of that? The evidence is, oh, well, she didn't say that it was they were called for a medical call. What difference would that have made? If Officer Bell had said in the affidavit, we were dispatched to the scene for a medical call, would that have alerted the reviewing magistrate judge or magistrate to a constitutional violation? No. Massey says that the affidavit has to disclose the basic facts, and Officer Bell did that and more, and I would urge the court just to examine the affidavit itself. It's a good affidavit. It explains Mr. Leonard's condition upon arriving at the scene, and he's thrashing around, has active bleeding, is hot to the touch, that it was unclear whether he had been assaulted or was simply high on narcotics. It explains that when they found out that the door was open, the officers went in to clear the home for safety and to ensure that there were no victims present or a potential perpetrator. And the video bears all of that out. When Officer Bell was in the home, she kept, I mean, she yelled like 10 times, crock at PD if you're in here, make yourself known. And it's clear from watching the video, she wasn't just rummaging, I mean, she wasn't rummaging around at all looking for evidence of drug use or drug possession. You're arguing about what did the facts establish, and what were the facts, and whether, and all these arguments were made in the objections, and they were all, the district court considered this. And we have a high standard of clear error on these fact points. So, I'm just pointing this out, so maybe you have something to offer in that regard. Well, the factual points, it's not a matter of a credibility call about what the witnesses testified at the hearing. I mean, you just look at the affidavit, and what she's saying is omitted as no matter what standard you want to call it, it's irrelevant. And she faults the magistrate judge, I'm sorry, she faults Officer Bell for not including in the affidavit about the broken coffee table, whereas that would have only strengthened the showing that the entry into Mr. Leonard's home was non-unconstitutional. And also, oh, I'm sorry, I see my time is up, Your Honor. Go ahead and finish your thought. Well, the one thought I, what I was going for is in the report and recommendation, and this is at 173-174 of the record. And she's talking about, the magistrate judge is talking about how, you know, after entering the home, but prior to the search warrant, Bell's body camera footage indicates the defendant seized and aspirated. She doesn't mention that Officer Bell actually ran to take care of him and got him in the proper position. But she talks about, well, Officer Bell said multiple times in the video that he had burns on his lips and that the smell of CPUs was so strong. Now, Officer Bell did comment, as we talked about earlier with Officer Key, yeah, he smells like he's super high. But the stuff about the burns on the lips, Officer Bell said that at 2347 to 2410 of the video after the entry into the home. And so she's faulting her for saying that as if they, but she had already entered the home, so the burns on the PC, the burn lips was not something Officer Bell knew at the time they made the entry into the home. So thank you, Your Honor. Thank you. We have your argument. And you've saved time for rebuttal. Mr. Peralta? Yes, ma'am. May it please the court. Counsel. My name is John Peralta. I represent the appellee in this case. I usually represent the appellant, so I'm sitting on the wrong side of the court today. But I do represent the appellee. His name is Xavier Jarrell Leonard. A number of points have been brought up, which I will address. I would like to begin, though, by noting that the good faith exception in this case cannot apply. Because if you look at the transcript of the body camera, it establishes that the officers did not merely suspect that Mr. Leonard was high on PCP. They were convinced that he was high on PCP. And some of the statements have been noted by the court. He was super high. This is going to be an overdose on illegal drugs. The burns on his lips, yeah, they may have been referenced at one point later on, but they were certainly visible at the beginning of the transcript. But none of that negates the possibility that there were also assailants in the house, victims in the house, other people in the house. I mean, in other words, for the exigent circumstances to have applied or to be close enough to the line, the fact that he's high, grant it. I mean, there's no real dispute in that, but so what? Well, two so what's. Number one, look at the evidence showing that he is high and compare it with the evidence showing that somebody is inside the house, of which there is none. There was no one observed going into the house. There was a cracked door. There was a cracked door. The place is in a complete state of dishevelment. Yes, a lot of people live that way, especially drug users. Well, but the coffee table was broken. There were other things like that. I mean, they did have some evidence of what has happened to this guy. Is that enough? It still doesn't show that there's anybody in the house. And what is more likely that Mr. Leonard took PCP in the house, which, by the way, there was no pipes or paraphernalia found on his person out in the street, but there were pipes and paraphernalia found in the house. So what if he used PCP in the house, stumbling around, as he was observed outside, stumbles into the table, breaks the table, which is where he may have gotten his cuts and scrapes, stumbles out the front door, and being in a state of inebriation, forgets to turn around and lock the door. All of which is completely plausible, but so, again, doesn't mean that the officer's explanation for why they went in, what they thought at the time, wasn't also plausible. Well, because I am giving you specific articulable facts about his state as he was out on the pavement. He was certainly high. That is without question. But where are the specific articulable facts showing that there is a dangerous person inside the house or that there is a second victim that is in immediate need of medical assistance? Because that's what the case law requires. A family member who could help him, or a family member who might know he's diabetic, or a family member who might be able to help them render aid to him. That is, again, a possibility. You'll have to understand that the government in their brief admits that these officers acted only on mere possibilities, where the evidence on PCP, overdose. But what we're not supposed to do is hold officers to hindsight, 20-20 vision. Yes, and I agree with that. You don't second guess the officers, I think is what one of the cases says. So what is our standard of review? You heard me ask counsel opposite. Grappling with this question, is it close enough to the line? How do we assess that? Well, I've been struggling with that as well. I've been trying to come up with some way for the court to explain this situation in a clearer way that gives guidance. I think the government seems to think that there is a large gulf between the actual violation and the close enough to the line that sort of provides a safe harbor for officers who violate the Fourth Amendment. I don't think that's workable at all. Close enough to the line, that's not workable either. My suggestion would be something that the court uses very often, and that is analyzing abuse of discretion. Where there is a zone of reasonable disagreement amongst district courts. And if a district court below, if you could have reasonable disagreements between reasonable district judges, then it will not be an abuse of discretion. Well, let's talk about reasonable disagreement between courts. Is there any way for you to prevail in this case without creating a circuit split with the Sixth Circuit's decision in McLean? Well, is there any way I can prevail given the circuit split? Yes, absolutely. And how would you distinguish McLean? McLean is easily distinguished. And that is because in almost all the cases that I looked at, the exigency is inside the house. In one of the Supreme Court cases, through the window, they viewed an assault in the house. In another case, they observed a man writhing and cursing and throwing things inside the house. So in McLean, the light is on.  The door is ajar. And a neighbor calls and says, the house is supposed to be unoccupied, but there's a light on inside. And those officers looked at that situation and said, we can go in through the open door. Absolutely. What was the exigency outside of the house in McLean? There wasn't one. What was the exigency inside the house in McLean? Inside the house, there's a possible burglary and a possibility of children. Based on a light. I hesitate to tell you this, but, you know, members of my family leave lights on the house all the time and have been known to leave that doors open. But that doesn't mean there's a burglary. I mean, you just, with my friend Judge Wilson, you were just going through a whole series of counterfactuals about what could have happened and who could have broken the table and who could have stumbled out in inebriation. That's just not the way that the Fourth Amendment, to say nothing of the exclusionary rule, works. And I guess I'm the kind of lawyer that gets down to basics. We're talking about the Fourth Amendment. Entry into the home without a warrant is the chief evil against which the Fourth Amendment is directed, period. And when you have exigencies inside the house, that is sufficient to allow law enforcement, if they have specific articulable facts showing those exigencies, not just guesses, speculation, that's not enough, then they may enter without a warrant. So does it have to do with whether or not they're saying that some exigent circumstance exists, like they're identifying a light and saying, we need to go in because the light's on? I thought that that was what the district court was criticizing, that the government doesn't say whether it believes the officer's conduct nearly satisfied the emergency aid exception, that a protective sweep was required, or that some other exigent circumstances existed. The government really said there's lots of unknowns, and it's possible that a perpetrator or a family member was inside. That it doesn't, like, pick one in the path and say, we're going in because of this reason. It just has a whole potpourri throughout. So whereas in the other case, it's about a light, and they think somebody's in the house, and there's a burglary. I think when you have a neighbor who's familiar with the house, this happened at nighttime, they observed lights on in a house that had been vacant for months, and that alone indicated to them that something nefarious was going on inside the house, probably a burglary. They call the police. The police verify the lights are on. Then they approach the house, and they see the door actually had been opened, and the deadbolt had been pushed so that it wouldn't close all the way. And that was enough for the officers to think that this is either a burglary or there's some children in here up to no good. I was going to say mischief. That's my Dennis the Menace reference. But that was enough for them to enter the house because the exigency was inside the house. This exigency is so much more significant, like so much more significant. That's what I'm struggling with on your McLean argument is that compared to a neighbor calling and saying, hey, I think the house is supposed to be unoccupied with lights on. I mean here you have just a horrific video, and we've all seen it, and it's really painful to watch the first six minutes of that video, and the officers are clearly dealing with a man, an extremist, a very difficult set of circumstances, and it's very hard to watch that video and walk away thinking anything other than like these police officers are just doing their level best to take care of this community and this man. And I was in AUSA for a long time and assistant DA for a long time, and I admire our police officers, and even as a defense attorney I thank them for their service when they testify before I cross-examine them on me. But I have no doubt that Sergeant Bell and Sergeant Key, it's a tough job, absolutely, and they have to make judgment calls, but that does not excuse them from following the precepts of the Constitution, especially the sanctity of the home. It brings me to a more broad question, I guess, a broader question. Assume good faith exception doesn't apply. The court still has to go through a calculus with the exclusionary rule, right? Does the cost of excluding this evidence to society outweigh the benefits? The district court glanced at that, or maybe the district court analyzed it. It wasn't very lengthy, but this is a split-second decision the officers made. The video certainly suggests there was no subterfuge, there was no ulterior motive, there was none of that. Take them at their word. They were trying to take care of this man, just like Judge Oldham said, an extremist, and this goes on for a while outside before they go to the house. Are we not deterring completely legitimate conduct, like the very thing that people would want police to do if there is someone in a medical emergency, etc., and so forth? That is the risk, and that is why I'm asking. Well, it's the risk, but I guess if the risk outweighs the benefit here, the exclusionary rule shouldn't apply anyway. Well, no, I would disagree with that. What I was going to say, that makes me glad that I'm the one standing over here instead of you all, because you all have a difficult decision, all your decisions. But I would say a couple of things. First of all, as I started off, these officers were convinced that this was a PCP overdose, period. They had all the classic signs of a PCP overdose. They're out in the field, and Sergeant Bell is ticking off all the indicators saying that this is a PCP overdose. But then when they get over to the time to write the affidavit, all of a sudden that conviction is conspicuously absent. Sergeant Bell intentionally concealed the fact that they believed that this was PCP. When you get close, when you get to look at the affidavit, it says, well, it could be drugs, could be an assault. We don't know. That's wrong. They did know, and they said it on the body cam. Well, they suspected it. I mean, the audio of the body cam is pretty clear. You know, they spend some time being flustered and not exactly sure, and then they do talk about the PCP. But it's just – this gets to another question I had about how this all fits doctrinally, because Massey says we're supposed to shoehorn all of this into the first Leon factor, and the question is what I think you just got at, which is was there an intentional misleading of the magistrate judge by the affidavit? And the sentence, which I think merits quoting because I think it gets a little elided in some of the briefing, it was unclear if Xavier was assaulted by another person or was just under the influence of narcotics. So at the time of the entry into the home, the officer did not know which of those were true, or it could have been some third thing, I suppose. Now, she may have suspected that it was the latter, right, but the latter is not necessarily going to create the blood and the contusions and all the rest of that. I think the difference is the evidence of the assault is pure speculation. You have a broken table and you have an open door, which could easily be explained by other circumstances, which are likely explained by other circumstances. But you can't just say, well, it could be this, it could possibly be that, it might be this. Supposition, suspicion, and speculation is not enough to reach the bar of constitutional permissibility. It's just not. You have to have specific facts. They had specific facts on the drug use. They had nothing other than the broken table. Let me try to get at it this way because I have a very similar concern to the one that Judge Wilson just asked you about, which is we just take a step back and we think about this. The Supreme Court has been incredibly emphatic in telling us that exclusion is supposed to be the, quote, last resort, to quote the Hudson Court, right? Last resort. You don't do it first. You do it last. So there has to be some space between the constitutional violation and the exclusionary remedy. Agreed? They're not the same. Absolutely. Otherwise, what would last resort mean? They're not coextensive. Exactly. So there has to be some space. So simply saying, well, here's the standard for reasonable suspicion, here's the standard for entry, and here's the standard for what could have happened and what could have explained the table or the door or whatever isn't enough. You have to have something that justifies the societal costs. And if the point of that is to look at this and say, do we think these officers were behaving reasonably? Would I be comfortable with the officers treating a member of my family that way? It's really hard to watch the video and think these guys are just out to, like, get your client. Well, three things. I'm going to write them down because I always forget them. Yeah, please. The first one has to do with this mere possibilities. Any reasonable officer would know that you need more than a mere possibility to justify the entry, the warrantless entry, into someone's house. That's number one. That can be deterred. It must be deterred. Secondly, it would be the less than complete affidavit by Sergeant Bell. The district court listed many, many instances of nondisclosures that she felt were critical and necessary for the issuing magistrate to have a full picture of what went on below. I don't think reading that affidavit that the magistrate got a full picture. That is something that can also be deterred. I think it must be deterred. We must have officers, when there is a prior entry that is questionable, to have the honesty and the integrity to put the full story before the issuing magistrate. Otherwise, the magistrate's just a rubber stamp. Worse than that, rubber stamping prior unconstitutional conduct. So that can be deterred. And I forgot the third thing. I still forget the third one. I will think of it in a minute. OK. If you think about it. But I have a question. Yes, ma'am. The district court talks at length, and it's five pages or so, about why they should still do the exclusionary rule and the benefits of deterrence and whether they outweigh the cost. There's at least four pages of that discussion. And one of the points the district court talks about is the fact that the officers, in their cross-examination, pretty much say they do this all the time and they think it's totally normal. And the government's whole theory of this case is, and some of the questions we've heard today in answers, has been, these are just great police officers doing their job just perfectly, and we should cut them some slack on this little error because this is exactly what we want police to do. But in fact, the district court was appalled because they were saying, we do this all the time. We always go in. We're doing all these extra searches. And the court used that as a reason that these officers, these officers in particular, needed to be deterred because of their complete obliviousness or else disobedience of the idea of following the law. And is that a legitimate factor to consider, like the district court did, in weighing this cost-benefit analysis? It is, Your Honor, and you have hit upon number three. As you know, I think it's the Herring case, I think, that says that exclusion is proper when you have deliberate conduct, reckless conduct, grossly negligent conduct, or repeated or systemic negligence. And I think that last part is what Judge Crone was getting at. And that is, and I was floored when I heard the testimony at the hearing. And she's not a, she's a tough judge. Yes, ma'am. I'll swear to that. But she, I was floored when I asked them, well, you know, if you find somebody out in the street that's intoxicated, do you always go to their house? Because in my practice, you know, 10,000 cases, I've never heard that, ever. And they said, yes. And I said, well, if you go to the house and the door is open, do you go in? Now, Sergeant Bell, to her credit, said the right thing. It depends on the circumstances. But Officer Noyola said, if the door is open, I go in. And I couldn't believe that. And to me that shows that it's more than just an isolated incident, that he was trained somehow to do that, it appears. I don't know that for a fact. I don't want to cast aspersions on his agency. But it would appear that he thought, as an experienced officer, that that was appropriate for him to do. And that really took me aback. And that is one of the reasons that I wanted to put forward as a reason to deter. So you have the use of mere possibilities. You have the less than complete affidavit. And then you have this systemic, possibly systemic, activity on the part of law enforcement that violates the Fourth Amendment. I just have a few minutes left. I think I've covered just about everything. Not in the order that I wanted, but I think I did. So I would just respectfully urge this court to affirm Judge Crone's order granting the motion to suppress and remand for further action consistent with your opinion. Thank you very much. We have your argument. Mr. Veselsky, you've saved time for rebuttal. One point that counsel raised that the officers were convinced that Mr. Leonard was high on PCP. He didn't cite any record evidence of that. I'm not aware of any evidence of that. In fact, in the video, and this is at 13 minutes 30 seconds to 13 minutes 41 seconds, this is after the entry into the home. The firefighter EMT comes along. I think his name is Jarvis. He's very nice, trying to do the right thing. One of the first things he asks Officer Bell is, is he high on PCP or opioids? What does Officer Bell say? We don't know. She keeps saying, we don't know. That doesn't sound to me like she's convinced that he's high on PCP. She's a former EMT. When the man's life is on the line, she's not telling the firefighter EMT that, oh, yes, he is. That's why he went into the home. She's saying, we don't know. And that's exactly what she said in her affidavit, that it was unclear. And, you know, as you pointed out in the brief, it would be irresponsible for her to say anything else. Could I ask, is it appropriate for Officer Bell to enter the house in the hopes that she could find someone who would shed light on Leonard's situation? Is that an appropriate reason to enter the house? Under these circumstances, absolutely, Your Honor. Shed light on the situation when we know he smells, reeks of PCP and is having delusions and all of the symptoms of that? Yes, Your Honor, because it's key to remember through all of this, Mr. Leonard was in no condition to give any explanation of what was happening. Yeah, why did they need an explanation when the medical people are already there on their way and they're already rendering aid and he's having a drug incident? Well, Officer Bell was the one protecting them and rendering some aid. At the time they entered into the home, medical personnel had not arrived, and it was eminently reasonable for them to enter into that house. Yes, they knock on the door and no one answers, but what if an aunt or a mother is in the back room with a CPAP machine going on and sleeping and can't hear it, they go in, they explain the situation, or what happens if What does that have to do with it? I'm sorry, what is the CPAP person? There might be somebody in the home that can shed light on the situation. What do you mean shed light? Help me understand what you're talking about. What is that person going to add to the situation? I thought it was because there might be a person who's a victim or a suspect who beat him up, but now it's because they're going to help the medical providers? What would they be doing? Well, they could say, oh, Xavier does this all the time. He has this medicine in this cabinet. Let me get it for you. Or another possibility is Mr. Leonard wasn't taking drugs on his own. Maybe someone else in there had passed out or was in need of medical attention themselves. But they knock on the door and nobody answers. So why knock if they can just go in anyway? Well, because if someone is there and they answer, then they don't have to enter. But when they don't, I mean the odds of finding someone inside who will help shed light on the situation, whatever the information there, greatly diminishes because nobody's answering. Well, one of the reasons they were potentially entering was to find a suspect, and they're not going to yell out, oh, I'm hiding in the closet back here. So the fact that no one responded doesn't resolve the issue, and Judge Boggs in his concurrence in McLean discusses this very thing, that the fact that no one answered the door doesn't resolve the uncertainty. And in terms of the mere possibilities that opposing counsel talked about, I think he's confusing the exit circumstances exception with the good faith exception. And again, I just point the court to McLean that talks about that, and we discuss it in our brief. And ultimately, all of this comes down to the exclusionary rule. And Leon and the four-factor, I mean all of that is just a way of channeling the ultimate determination of, is this a case that you should apply the extreme sanction of the exclusionary rule? And counsel is right. It does require intentional conduct that was patently unconstitutional, and that any reasonable person would not find that here. And, Your Honor, I'm sorry. Are the district court's statements in its opinion adopting the magistrate judge's report, are those fact findings that, in fact, just go the other way? I think that would ultimately go to – I would say that the review there would be de novo, Your Honor, because it's a determination of whether the extreme sanction of the exclusionary rules should apply, and I would think of reviewing court. So we reweigh the benefits and costs de novo? Correct, Your Honor. And I see my time has expired. Thank you. We have your argument. We appreciate both arguments in this case, and we note that Mr. Peralta has been court appointed, and we appreciate your service. Thank you.